NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0354n.06

Case No. 23-3501

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 14, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| MICHAEL DARDEN, | ) | |
| Plaintiff-Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| MONTGOMERY COUNTY BOARD OF COMMISSIONERS, et al., | ) ) | |
| Defendants-Appellees. | ) ) ) | OPINION |

Before: BOGGS, COOK, and NALBANDIAN, Circuit Judges.

COOK, Circuit Judge. Infant N.D. tested positive at birth for Suboxone and passed his first month in the neonatal intensive-care unit. Upon his release, an Ohio agency placed him in the home of two experienced foster parents. Child services reached out to N.D.'s biological father, Michael Darden, but he denied paternity and asked the state not to contact him again. Over a year later, Darden filed for custody, but the state court determined that it was in N.D.'s best interests to remain with his foster parents. Darden now raises a bevy of federal claims against many of the agencies and individuals who played a role in these custody proceedings. Finding Darden's many claims to be either forfeited or meritless, we affirm the district court's decision to dismiss on all counts.

I.

Jill and Nick Kingston opened their home as foster parents to babies born exposed to addictive substances. One of these babies was N.D., who tested positive at birth for Suboxone and spent the first month of his life in a neonatal intensive-care unit. Upon his release from the hospital in February 2017, the Montgomery County Jobs and Family Services Children Services Division placed N.D. into the Kingstons' care.

N.D.'s biological mother identified plaintiff Michael Darden as the father, so around March 2017, a caseworker and N.D.'s court-appointed guardian ad litem each reached out to Darden. Darden, then a married man, was skeptical about his paternity. Although he admitted to having a brief extramarital affair with N.D.'s biological mother, he was no longer in contact with N.D.'s mother and thought that she may have financial motives to name him as the father. Darden asked N.D.'s guardian ad litem not to contact him again and not to contact his wife. It was only when N.D. was over a year old, after Darden received the results of a paternity test, that Darden expressed interest in visiting N.D.

Throughout this time, the Kingstons continued to care for N.D. Caseworkers monitored N.D. as he developed, observing that he was "constantly playing" with the Kingstons' other children and called the Kingstons "Mom" and "Dad." R.16-2 at 6. In December 2017, Jill Kingston opened Brigid's Path, a crisis-care nursery for treating other drug-exposed newborns like N.D. At a hearing in January 2018, the Kingstons attested that they loved N.D. and wanted to adopt him.

In July 2018, Darden had his first visit with N.D. and then filed for custody. Five days later, Montgomery County Children Services filed its own, competing motion for permanent custody. N.D.'s guardian ad litem supported entrusting N.D. to the county's custody.

Darden received court-appointed counsel to represent him in the custody proceedings. After a hearing on both custody motions, a state magistrate judge recommended granting permanent custody of N.D. to the county.

Judge Anthony Capizzi of the Common Pleas Court of Montgomery County, Ohio Juvenile Division, agreed with the magistrate judge's recommendation. Over Darden's objection, Judge Capizzi determined that granting permanent custody to Montgomery County Children Services was in N.D.'s best interest. In particular, Judge Capizzi expressed concern that Darden had a "limited relationship" with N.D. (in part because Darden waited over a year to establish paternity), Darden "ha[d] not prepared his home" for N.D., Darden "work[ed] out of state and ha[d] not explored child care options except to offer the job to the foster family," and the record reflected that while Darden was counting on his wife to help care for the child, she was "not willing" to do so. R.16-2 at 18. Judge Capizzi acknowledged that Darden "felt poorly treated throughout this process" and that Darden believed that the Kingstons had "received preferential treatment," but found that "[t]here was no evidence presented" that showed unequal treatment. R.16-2 at 18.

Darden appealed to the Ohio Court of Appeals which, in June 2020, affirmed Judge Capizzi's decision. The Ohio Court of Appeals shared the concerns that Darden "failed to complete his case plan" to undergo substance and mental health assessments, "did not have a safe place for the child to live," and "had no plan for providing care for the child" during the week while he worked out-of-state. R.16-3 at 11 ¶ 25. That court therefore granted permanent custody of N.D. to the Montgomery County Children Services, and the Kingstons subsequently adopted him.

Two years after the Ohio Court of Appeals rendered its decision, Darden filed this suit against many of the people and organizations involved in the custody proceedings: the Ohio

Department of Jobs and Family Services; the Montgomery County Board of Commissioners; Montgomery County Children Services, its director, and four of its employees; N.D.'s guardian ad litem; the Kingstons; and Brigid's Path. Darden's complaint raised nine claims against the defendants: (Count 1) 42 U.S.C. § 1983 Violations; (Count 2) Title VI of the Civil Rights Act § 1964 Discrimination; (Count 3) Fourteenth Amendment—Due Process Clause Violations; (Count 4) Civil Conspiracy/Tortious Interference with Parental Rights; (Count 5) Intentional Infliction of Emotional Distress; (Count 6) Loss of Consortium; (Count 7) Punitive Damages; (Count 8) 42 U.S.C. § 1983; and (Count 9) Respondeat Superior. He requested relief in the form of compensatory and punitive damages, attorney's fees and costs, a declaratory judgment, and several injunctions to "deem[] the decision and actions of [Montgomery County Children Services] that terminated Plaintiff Darden's parenting rights void, entitling [him] the opportunity to gain custody of his child," and to "permit [him] the right to seek redress in Probate court to reverse the adoption of N.D.," among other things. R.1 at 25. The district court subsequently dismissed the Ohio state agency from the suit based on sovereign immunity, and Darden does not challenge that decision.

The remaining defendants separately filed three motions to dismiss, raising a host of defenses. They argued that Counts 1–9 failed to state a claim on which relief could be granted, the *Rooker-Feldman* doctrine barred reopening N.D.'s custody proceedings, res judicata barred Counts 1–6, and Counts 1 and 8 were untimely. They further maintained that the county employees were entitled to prosecutorial immunity, quasi-prosecutorial immunity, and qualified immunity. Darden opposed the motions, arguing that res judicata, the *Rooker-Feldman* doctrine, and the various forms of immunity did not apply. Darden further argued that he had sufficiently pleaded his civil-conspiracy and intentional-infliction-of-emotional-distress claims (Counts 4–5).

The district court dismissed all counts, agreeing with the defendants that Counts 1–9 failed to state cognizable claims, Counts 1–6 were barred by res judicata, and Counts 1 and 8 were untimely. Darden now appeals.

## II.

At issue is whether the district court erred by granting the defendants' motions to dismiss. We review the grant of a motion to dismiss de novo, construing the complaint in the light most favorable to Darden. *See Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

### A.

To start off, do we have jurisdiction to hear this case, or is Darden impermissibly asking us to review the state court's judgment? Although the district court concluded that federal jurisdiction was proper, and the parties do not raise that issue on appeal, we must satisfy ourselves of federal jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

If a plaintiff loses a case in state court, he may only appeal through the state-court system or to the Supreme Court; federal district courts and courts of appeals have no power to review a state court's judgment. *See Reed v. Goertz*, 598 U.S. 230, 235 (2023). This principle, known as the *Rooker-Feldman* doctrine, operates as a limit on federal court jurisdiction. *See Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). We cannot hear "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The *Rooker-Feldman* doctrine, however, is narrow. It "is not a panacea to be applied whenever state court decisions and federal court decisions potentially or actually overlap."

5

*McCormick v. Braverman*, 451 F.3d 382, 395 (6th Cir. 2006). Usually, when a plaintiff loses in state court and then brings similar claims in federal court, a district court may exercise jurisdiction (even if the claim is doomed to fail under preclusion principles). *See id.* at 397. The district court only loses jurisdiction when the claim asserts the state-court decision itself is "the source of the injury." *Id.* at 393. "If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim" that we can adjudicate. *Id.*; *see, e.g.*, *id.* at 388, 392 (holding that *Rooker-Feldman* does not bar a claim that a state court's order was "based on fraud and misrepresentation").

Two custody scenarios illustrate the "source of the injury" inquiry. On the one side of the line is the situation where a state court "terminates a father's parental rights," and "the father sues in federal court for the return of his son on grounds that the" state court's application of state law "violates his federal substantive due-process rights as a parent." *Berry v. Schmitt*, 688 F.3d 290, 301 (6th Cir. 2012) (quotation omitted). In that instance, the father "is complaining of an injury caused by the state judgment and seeking its reversal," which "he may not do." *Id.* (quotation omitted). Only the Supreme Court would have jurisdiction to hear the father's appeal of the state court's decision—a federal district court would have no such power. *See id.*; *see also McCormick*, 451 F.3d at 395 (concluding that *Rooker-Feldman* barred a plaintiff from complaining that a state-court order was issued "absent any jurisdiction" and that the order "itself" caused harm).

On the other side of the line lies *Holloway v. Brush*, 220 F.3d 767 (6th Cir. 2000) (en banc). There, an Ohio state court awarded custody of two children to the state and ultimately allowed foster parents to adopt them. *Id.* at 771–72. The children's biological mother opposed the custody proceedings and, when that failed, filed a § 1983 action in federal court against several state entities and a caseworker who played a role in the proceedings. *Id.* The *Rooker-Feldman* doctrine, we

6

held, did not deprive us of jurisdiction. *Id.* at 778–79. The source of injuries was not the state-court decision itself, but rather the defendants' false testimony and other alleged misconduct during the proceedings. *Id.* at 779. The federal suit and the state-court actions were also "clear[ly]" distinct: the state-court proceedings asked whether the mother's continued custody was in the best interests of the children, whereas the federal suit asked "whether certain actions in the course of those proceedings may have involved a violation of [the mother's] federal constitutional rights for which the responsible party may be held liable for damages." *Id.* "That [the mother] would *also* like this court to restore her children to her, which it cannot do," we explained, "is irrelevant" to determining whether we have jurisdiction to hear her claim. *Id.* at 777; *see also Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 606 F.3d 301, 310 (6th Cir. 2010); *Brokaw v. Weaver*, 305 F.3d 660, 671 (7th Cir. 2002).

This case is indistinguishable from *Holloway*, making our jurisdiction proper. As in *Holloway*, a child's biological parent alleges that third parties made misrepresentations, prevented visitation, and otherwise committed misconduct during state-court custody proceedings. As in *Holloway*, the parent requests compensatory damages along with an improper form of relief (an injunction to roll back the adoption process and regain parental rights). And as in *Holloway*, the question of whether the defendants can be held liable is distinct from the issue that the state confronted in custody proceedings (that is, determining the best interests of the child). In other words, the "source of the injury" that Darden complains of is the defendants' conduct during the custody proceedings, and not the custody award itself. *McCormick*, 451 F.3d at 393. Thus, just as the *Rooker-Feldman* doctrine did not apply in *Holloway*, it also does not bar our jurisdiction here.

B.

Turning to the merits, did the district court err by dismissing the claims against Darden? Fed. R. Civ. P. 12(b)(6). We hold that it did not.

In his appellate brief, Darden does not challenge the district court's decision to dismiss Counts 1 and 8 on statute-of-limitations grounds. Nor does he challenge the dismissal of Counts 5, 6, 7, or 9 based on a failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) (explaining that arguments not developed on appeal are deemed forfeited). Even though Darden's brief does briefly mention the existence of some of those claims in the statement of the case and the conclusion, "it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Conlan Abu v. Dickson*, 107 F.4th 508, 520 (6th Cir. 2024) (quotation omitted).

That leaves us only with Counts 2, 3, and 4. The question for each of these counts is whether Darden's complaint "contains sufficient factual matter to state a claim to relief that is plausible on its face." *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 758 (6th Cir. 2020) (quotation and alterations omitted). Although some of the defendants ask that we treat Counts 2 and 3 as forfeited below, the district court treated those claims as deficiently pleaded rather than forfeited. We accordingly will treat those arguments as preserved and consider each in turn. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011).

*Count 2.* In his complaint, Darden claimed that the county employees and N.D.'s guardian ad litem violated Title VI of the Civil Rights Act by discriminating against him on the basis of race. Title VI prohibits racial "discrimination under any program or activity receiving Federal

8

financial assistance," 42 U.S.C. § 2000d, and individuals can sue to enforce this provision through a private right of action, *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001).

We agree with the district court that Darden failed to make out a Title VI claim because his complaint never alleged that any defendant received federal funding. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Darden now argues that the district court should have known that Montgomery County Children Services receives federal funding. It is, however, a plaintiff's burden to plead facts to support each aspect of his Title VI claim. *See id.* Darden never mentioned such funding below, and even now cites no authority showing that any defendant receives federal funding.

*Count 3*. Darden claimed that the same group of individual defendants violated his Fourteenth Amendment rights by scheming to deprive him of his child. Again, we find that Darden fails to demonstrate an entitlement to relief. *See* Fed. R. Civ. P. 12(b)(6). A plaintiff in a civil suit can vindicate his due-process rights under 28 U.S.C. § 1983, but not as a freestanding due-process claim. *See Warthman v. Genoa Twp. Bd. of Trs.*, 549 F.3d 1055, 1062–63 (6th Cir. 2008); *Thomas v. Shipka,* 818 F.2d 496, 499 (6th Cir. 1987), *vacated on other grounds*, 488 U.S. 1036 (1989); *cf. Egbert v. Boule*, 596 U.S. 482, 493 (2022). And though we will sometimes construe so-called "due-process claims" as § 1983 actions, *e.g.*, *Jordan v. Murphy*, 205 F.3d 1340 (6th Cir. 2000) (unpublished table decision), that would be fruitless in this instance, as Darden's two other § 1983 claims based on the same facts were both untimely.

On appeal—and for the first time—Darden argues that Ohio law makes available a freestanding cause of action to vindicate due-process rights. He is mistaken. *See PDU, Inc. v. City of Cleveland*, No. 81944, 2003 WL 21555157, at *5 (Ohio Ct. App. July 10, 2003) (explaining that Ohio has no state-law analog to § 1983). Although Darden cites "*Ross v. Ross County Board*

*of Commissioners* (Ohio Sup. Ct. 2005)" as establishing a state due-process claim, Appellant's Br. 43, neither we nor the defendants can find that case. In any event, Darden's complaint only cited "the Fourteenth Amendment Due Process Clause"—not Ohio state law. R.1 at 18–19 ¶ 69.

*Count 4.* That leaves us with just one remaining claim. Did Darden state a cognizable claim under Ohio tort law against the Kingstons, the county employees, and N.D.'s guardian ad litem for conspiring to interfere with his parental rights?

Like the district court, our answer is no. Ohio law imposes civil liability on those who conspire to commit certain "child stealing crime[s]." Ohio Rev. Code Ann. § 2307.50. As relevant here, a parent who is deprived of a "parental or guardianship interest," *id.*, can recover damages against any person who, "knowing the person is without privilege to do so or being reckless in that regard, . . . entice[s], take[s], keep[s], or harbor[s]" a child, *id.* § 2919.23(A). *See also Giambrone v. Berger*, 566 N.E.2d 711, 714 (Ohio Ct. App. 1989) (finding no authority for recognizing an Ohio "common-law theory of tortious interference with custody").

Darden's complaint does not sufficiently allege that the Kingstons, N.D.'s guardian ad litem, or any of the county employees knew that they were "without privilege" to keep N.D. in the Kingstons' care or that they were "reckless in that regard." To the contrary, according to the complaint, state officials placed N.D. with the Kingstons shortly after his birth because Jill Kingston "had experience with babies born to opioid addicted mothers." R.1 at 10–11 ¶¶ 20–21. Darden did not believe that he was N.D.'s father at that time, so he told N.D.'s guardian ad litem that he did not want any contact from Montgomery County Children Services until a paternity test proved that he was the father. That only changed in May 2018, when Darden at last "received notice that he was in[]deed the biological father of" the then-16-month-old N.D. R.1 at 12 ¶ 32. Of course, by that point, Montgomery County Children Services, the Kingstons, and N.D.'s

guardian ad litem had long been entrusted with N.D.'s care, and the state court approved that arrangement on multiple occasions.  On this record, Darden has not alleged facts to support a conclusion that any of the defendants knew that they were "without privilege" to keep N.D. outside Darden's custody, or that they were "reckless in that regard."  Ohio Rev. Code Ann. § 2919.23(A).

Because we conclude that the district court properly dismissed all of Darden's claims, we need not evaluate any of the defendants' other affirmative defenses.  The decision of the district court is **AFFIRMED**.